960 F.2d 149
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AMERICAN STATES INSURANCE CO., Plaintiff-Appellee,
v.
Robert and Evelyn GLOVER, Defendants-Appellants.
 No. 91-5289.
 United States Court of Appeals, Sixth Circuit.
 April 16, 1992.
 
 Before KENNEDY and BOGGS, Circuit Judges, and EDGAR, District Judge.*
 PER CURIAM.
 
 
 1
 American States Insurance Co. ("ASI") filed this suit against Robert and Evelyn Glover to recover under certain indemnity agreements for payments that the company had made on various bonds issued on behalf of the Glovers. The Glovers made several counterclaims against ASI. All of the counterclaims were ultimately dismissed either voluntarily or by summary judgment before trial. At the close of all the evidence at trial, the district court granted ASI's motion for a directed verdict and entered judgment for ASI in the amount of $1,429,206.53. The Glovers appeal the grant of a directed verdict. They also appeal the district court's refusal to allow them to amend their claims before trial and challenge several evidentiary and discovery rulings made by the district court. For the reasons discussed below, we affirm the judgment of the district court.
 
 
 2
 * Robert Glover and his ex-wife Evelyn Glover were the owners of two construction companies, Glover Construction Co., Inc. and Glover Contracting Co. (the "Glover Companies"). Robert and Evelyn Glover each owned fifty percent of both corporations. This case arises from several bid, payment, and performance bonds issued by ASI on behalf of the Glover Companies for various construction projects in Indiana and Kentucky. On July 1, 1977, the Glovers agreed to indemnify ASI in return for ASI's issuance of the bonds. The indemnity agreement executed by the Glovers specifically provided as follows:
 
 
 3
 The contractor and the indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and for expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefore.... [T]he Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity, or expediency existed, and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of liability to the Surety.
 
 
 4
 Relying on the Glovers' indemnity agreement, on March 13, 1979 ASI issued a "Contractor's Combination Bid Bond & Bond for Construction" on behalf of the Glover Contracting Co., Inc., covering 100% of its total bid of $8,310,694 for construction of a high school in New Albany, Indiana. Work on the project was substantially completed by the fall of 1981.
 
 
 5
 In 1979, Robert Glover's parents sued the Glovers and the Glover Construction Co. for breaching a purchase agreement and an employment contract concerning Glover Construction. The parents won a judgment of approximately $360,000. On January 5, 1981, ASI, again relying on the indemnity agreement, issued $150,000 and $210,000 supersedeas bonds for Glover Construction and the Glovers, respectively.
 
 
 6
 On March 17, 1981, the Glovers executed another indemnity agreement identical to the indemnity contract they had entered into in 1977. On August 18, 1981, ASI executed payment and performance bonds in the amount of $2,989,250 as surety for Glover Contracting's construction of a lagoon and pump station in New Castle, Indiana. On August 31, 1981, ASI issued a payment bond in the amount of $2.5 million and a performance bond in the amount of $6,279,250 as surety for Glover Construction's project involving the building of a tank washing facility for the Corps of Engineers in Fort Knox, Kentucky.
 
 
 7
 Robert and Evelyn Glover were divorced in May 1982. However, the Glovers were not able to reach a property settlement and this greatly complicated the operation and financial condition of the Glover Companies. The Glover Companies depended on a $750,000 line of credit from the First National Bank of Henderson to pay the subcontractors and suppliers on construction projects. Without this line of credit, the Glover Companies would become insolvent. On September 17, 1982, after the promissory notes securing the line of credit came due for renewal, Robert Glover withdrew his personal guarantee on the notes in an effort to force his former wife to buy the companies. Due to Robert Glover's withdrawal of his personal guarantee and his failure to supply the bank with audited financial statements, the bank did not renew the Glover Companies' line of credit.
 
 
 8
 The property settlement battle between Robert and Evelyn Glover continued. The Glover Companies were insolvent and unable to pay their subcontractors and suppliers. The appeal of the $360,000 award to Robert Glover's parents was pending before the Supreme Court of Kentucky. In late September 1982, Robert Glover spoke with Ed Sullivan, ASI's Vice President for Bond Claims, about the financial condition of the Glover Companies. Glover did not tell Sullivan that he had refused to continue his personal guarantee on the line of credit. Glover requested $400,000 interim financing to complete the Fort Knox and New Castle projects. Sullivan retained Glen Baker, an accountant experienced in surety and construction matters, and Don Curry, a contract surety bond and construction management consultant, to review the Glover Companies' records and determine their financial condition. By October 19, Baker and Curry had prepared preliminary estimates that projected that it would take at least $1.3 million to complete the Fort Knox and New Castle projects.
 
 
 9
 The Glovers contend that Sullivan assured them that ASI would provide the interim financing necessary to complete the jobs. ASI maintains that it never agreed to provide such financing to the Glover Companies and that neither the bonds nor the indemnity agreement obligated them to lend money to the companies to complete the projects. The Glovers assert that after ASI's initial agreement to provide the financing necessary to complete the jobs, ASI, for some reason, embarked on a course of conduct designed to eliminate the Glover Companies as the general contractors on the two construction jobs and to force the companies into bankruptcy.
 
 
 10
 On October 20, Sullivan hand delivered a letter to Mr. Glover. In it, ASI expressly refused to lend the Glover Companies the money to finance the completion of the construction jobs. The letter also stated that ASI would make all necessary payments under the bonds and requested collateral sufficient to cover its projected loss. At a board meeting of the Glover Companies held on October 26, Sullivan delivered another letter setting out ASI's decision to refuse to finance the Companies' completion of the jobs. Robert Glover then told his Board and Sullivan that the Glover Companies were insolvent and could not complete the construction projects.
 
 
 11
 On October 27, 1982, Robert Glover and the Board of Directors agreed to turn the construction jobs over to ASI for completion. ASI began paying the overdue bills of the subcontractors and the suppliers on the Fort Knox project. However, on October 28, after Glover received a $102,000 progress payment on the Fort Knox project, the Board agreed to rescind its authorization to turn the jobs over to ASI.
 
 
 12
 In the meantime, the Supreme Court of Kentucky affirmed the award of money damages to Robert Glover's parents. ASI demanded that the Glovers pay the judgment immediately. On November 4, 1982, the parents filed a motion for judgment against ASI based on the supersedeas bonds it had issued on behalf of Robert and Evelyn Glover and Glover Construction. ASI claimed that it would not pay on the bond until the judgment creditors first executed on the judgment by attaching the Glovers' assets. On November 8, 1982, Robert Glover's parents began execution on the judgments, attaching the individual and corporate assets and bank accounts of Robert and Evelyn Glover and Glover Construction. On November 10, 1982, as a result of these mounting financial problems, the Glover Companies filed for Chapter 11 bankruptcy. After the court granted the parents' motion for entry of judgment against ASI, ASI paid the judgment pursuant to the supersedeas bonds. The Glover Companies converted the Chapter 11 bankruptcy to a Chapter 7 liquidation on December 7, 1984.
 
 
 13
 ASI eventually paid subcontractors and suppliers $1,279,206.53 to complete the New Castle and Fort Knox construction projects. ASI claims that all of these payments were reasonable, necessary and made in good faith. The Glovers, however, contend that during both the Chapter 11 and Chapter 7 proceedings, ASI, in bad faith and with intent to cause the Glovers additional financial losses, failed to take any measures to reduce its losses on the two projects even though it was in a position to do so. For instance, the Glovers claim that under the projects' contracts, ASI had the right to bring claims against the owners of the construction projects to recover for cost overruns due to unforeseen problems. ASI allegedly failed to pursue these claims for cost overruns on both projects. The Glovers maintain that pursuit of these claims would have mitigated damages by $1,694,700, which would have more than covered ASI's claimed losses. According to the Glovers, therefore, ASI is entitled to no damages.
 
 
 14
 ASI filed this suit to recover the $1,279,206.53 that it had paid to subcontractors and suppliers to complete the jobs. ASI also sought to recover the $150,000 it had paid on behalf of the Glovers under the supersedeas bond. The Glovers responded to the lawsuit with several counterclaims, including tortious interference with contractual relations, fraud, breach of fiduciary duty, abuse of process, breach of agreed upon orders entered by the bankruptcy court, intentional infliction of emotional distress and a RICO violation. Eight years of litigation ensued and all of these counterclaims were ultimately dismissed, either voluntarily or by summary judgment prior to trial.
 
 
 15
 In March 1987, four years after the initiation of this lawsuit, the Glovers attempted to allege two new counterclaims in their motion to file "a joint fourth amended complaint and third amended counterclaim." The Glovers charged ASI with "failure to cooperate ... and follow good surety practice" and with purported misrepresentation of ASI's willingness to provide financing for the Glover Companies. The district court denied the motion to amend, noting that the two new counterclaims were extremely untimely and not the result of some newly-discovered evidence. The district court also denied three later motions by the defendants seeking to assert these counterclaims.
 
 
 16
 The case proceeded to trial and the Glovers' sole defense was ASI's failure to mitigate damages by its alleged refusal to pursue claims against the owners of the two construction projects. At the close of evidence, the district court granted ASI's motion for a directed verdict, holding that the indemnity agreement required the Glovers to pay ASI. The court entered judgment in favor of ASI in the amount of $1,429,206.53. The Glovers claim that the trial court erred in granting the directed verdict and in failing to grant leave to amend the fourth amended complaint and third amended counterclaim. The Glovers also contest one discovery ruling and two evidentiary rulings. We will treat each of these issues in turn.
 
 II
 
 17
 Directed verdicts are granted pursuant to Federal Rule of Civil Procedure 50(a). This court reviews the grant of a directed verdict under the same standard used by the trial court. Sawchick v. DuPont, 783 F.2d 635, 636 (6th Cir.1986). The court must ascertain "whether the evidence is such, without weighing the credibility of the witnesses or considering the weight of the evidence, that there is substantial evidence from which the jury could find in favor of the party against whom the motion is made." Hill v. McIntyre, 884 F.2d 271, 274 (6th Cir.1989). A court should enter a directed verdict only when it is clear that a reasonable person could come to but one conclusion from the evidence presented. Lewis v. City of Irvine, Ky., 899 F.2d 451, 454-55 (6th Cir.1990). Such is the case here.
 
 
 18
 The Glovers' fundamental argument is that the directed verdict was error because the evidence presented at trial established that ASI failed in its duty to mitigate losses under the indemnity agreement. The basic contention is that once ASI took over the construction projects it had a duty to mitigate losses. The Glovers maintain that the contracts at the two construction projects granted to the contractor the right to recover certain cost overruns from the owners of the projects. Thus, according to the Glovers, ASI had a duty to pursue these claims and, since it did not, the surety is now responsible for those cost overruns. In sum, the Glovers do not contest the validity of the payments made to complete the projects, but contend that ASI reasonably could have avoided any loss by pursuing claims against the owners of the projects. The Glovers argue from general contract law that an injured party may not recover for damages that might have been reasonably avoided.
 
 
 19
 ASI argued, and the district court held, that under Kentucky law failure to mitigate is not a defense to an indemnity action. Therefore, under Kentucky law and the terms of the indemnity agreements, the Glovers could successfully attack payments made by ASI only by pleading and proving fraud or lack of good faith. United States Fidelity & Guarantee Co. v. Napier Electric & Construction Co., 571 S.W.2d 644, 646 (Ky.App.1978). We agree.
 
 
 20
 In Napier, a surety sought to recover money it had paid to complete a construction project. The principal had executed an indemnity agreement, like the one in this case, which obligated the indemnitors to reimburse the surety for all amounts paid "in good faith." The jury in Napier awarded the surety less than the actual amount it had paid to complete the project, concluding that the surety could have completed the project for less and had, therefore, failed to mitigate damages. The surety appealed, contending that it was entitled to the full amount of its claim. The Court of Appeals agreed, holding that the nature of the indemnitors' liability is determined by the terms of the indemnity agreement itself. Since the indemnity agreement called for reimbursement of all payments made in good faith, the indemnitor could attack the payments "only by pleading and proving fraud or lack of good faith by the surety." Id. at 646.
 
 
 21
 The right to recover according to the terms of an indemnity agreement is the well-settled law of Kentucky. See National Surety Corp. v. Peoples Milling Co., 57 F.Supp. 281, 282 (W.D.Ky.1944). In the Napier case, instead of simply allowing recovery for all payments made in good faith according to the terms of the indemnity agreements, the jury was asked to determine such matters as the fair market value of the labor and materials used to complete the construction project. In other words, the jury applied the essence of mitigation analysis. The Appeals Court held that the jury should not have considered such matters because the express language of the indemnity agreement permitted recovery for all payments made in good faith. Only fraud or bad faith, therefore, could be a basis for challenging payments. There could be no claim that the payments made were "excessive" when measured against the fair market value of the cost of completion of the project.
 
 
 22
 In this case, ASI made good faith payments under similar indemnity agreements. In addition to its reliance on Kentucky law, which does not require mitigation under such indemnity agreements, ASI asserts that it could not have pursued the contract claims that the Glovers alleged their companies would have had against the owners of the projects, since any such claims belonged to the bankruptcy trustee. In any event, we hold that a directed verdict was proper in this case since the law is clear and the facts were not in dispute. ASI paid to complete the projects, the indemnity contracts entitled ASI to recovery from the Glovers for good faith payments made, and ASI was under no duty to mitigate by pursuing possible claims against the owners of the construction projects.
 
 III
 
 23
 The Glovers also contend that the district court erred in failing to allow them to amend their complaint and add a counterclaim. Over four years after this case was filed, the Glovers moved to amend their fourth amended complaint and their third amended counterclaim. The Glovers wanted to include counterclaims for "failure to follow good surety practice" and for ASI's alleged misrepresentation of its willingness to provide interim financing to the Glover Companies. The district court did not allow the Glovers to add the counterclaims. The court was troubled by the fact that the defendants had waited so long to file these counterclaims, especially since the Glovers did not allege that the amendments were founded on the discovery of new evidence. Further, discovery up to that point had been extensive but limited in scope. To allow the amendments would have required that most depositions be retaken, thus severely protracting the litigation.
 
 
 24
 The decision of whether or not to allow amendments to the pleadings pursuant to Federal Rule of Civil Procedure 15(a) is within the discretion of the trial court. Zenith v. Hazeltine Research, Inc., 401 U.S. 321 (1971). One of the primary factors that a court should consider when making this determination is possible prejudice to the opposing party. Moore v. City of Paducah, 790 F.2d 557, 559 (6th Cir.1987). The Glovers argue, citing Moore, that unjustified delay alone cannot provide the basis for denial of a motion to amend. However, the problem in Moore was that the district court had denied the motion solely for undue delay, in a case where prejudice to the opposing party was admittedly negligible. This is not the case here. The district judge found not only an unjustified four-year delay, but also found that requiring the reopening of discovery on the basis of the amorphous counterclaims would result in substantial prejudice to ASI.
 
 
 25
 The Glovers argue, alternatively, that ASI would not have been prejudiced because it had been on notice of these claims since the allegations had been evident throughout the litigation even though they were not formally pled. ASI counters that the proposed amendments were entirely new claims and it would have been greatly prejudiced by the amendment, especially since it would have had to retrace all of the discovery steps. ASI also maintains that the disallowed counterclaims stated no viable cause of action in any event.
 
 
 26
 We cannot hold that the district court abused its discretion in denying the Glovers' motion to amend. We therefore affirm that judgment of the court.
 
 IV
 
 27
 The Glovers present three additional issues on appeal. First, they contend that the district court should have allowed the discovery of certain correspondence between ASI and its reinsurers concerning this litigation. The court found that these documents were protected by the attorney-client privilege and by the work product doctrine under Federal Rule of Civil Procedure 26(b)(3). The Glovers claim that the information in the correspondence was essential to their counterclaims. Since we find that the district court did not err in refusing to allow the addition of these counterclaims, we need not consider whether the court erred in refusing to compel discovery of evidence relevant only to the disallowed counterclaims.
 
 
 28
 The Glovers also contend that the district court erred in making two evidentiary rulings. The first involved an alleged statement made by ASI's attorney, Mr. Grubbs, to the Glovers' divorce lawyer, Mr. Smith. Grubbs is alleged to have stated that ASI wanted to run Robert Glover off of job sites and out of Kentucky. The Glovers claim that Grubbs made this comment at a seminar at which he was the guest speaker. In a motion in limine, the judge excluded the comment from evidence. The Glovers recognize that this evidence is relevant only to their counterclaims and that we need consider this issue only if we find that the district court erred in denying their motion to amend. We do not, therefore, consider this issue.
 
 
 29
 The second evidentiary ruling concerned admission of the deposition testimony of the Glovers' accountant. The Glovers wanted to introduce the testimony to show that Robert Glover had previously been conservative in estimating and pursuing other contract claims against other owners on other projects. The court excluded the evidence. On appeal, Robert Glover claims that the evidence could have established his expertise in determining the exact amount by which ASI could have mitigated damages if it had pursued the alleged contract claims against the owners of the projects in this case. There was little proof that these prior claims bore any resemblance to the current ones and the judge did not abuse his discretion in refusing to admit portions of the depositions. In any event, the evidence was relevant only to the issue of mitigation of damages, which the district court properly held was not a defense given the terms of the indemnity agreements.
 
 V
 
 30
 For the reasons stated, we AFFIRM the judgment of the district court.
 
 
 
 *
 The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee, sitting by designation