UNITED STATES FIDELITY &
GUARANTY CO., Plaintiff,

v.

Steven J. FEIBUS, Lori M. Feibus, Anthracite Plate Glass Co., Inc., Anthracite Glass Corp., Anthracite Window Corp., Luster–Life, Inc., Shirley S. Feibus, and Robert C. Statsman as Trustee for the Estate of Samuel S. Feibus, Defendants.

No. 3:CV–95–1925.

United States District Court,
M.D. Pennsylvania.

May 8, 1998.

Ian A.L. Strogatz, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, David I. Bookspan, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, J. William Ernstrom, Ernstrom & Dreste, Rochester, NY, for United States Fidelity & Guaranty Company.

Michael H. Roth, Scranton, PA, for Steven J. Feibus, Lori M. Feibus, Anthracite Window Corp.

Richard S. Bishop, Scranton, PA, for Anthracite Plate Glass Company, Inc., Luster–Life, Inc.

John P. DiIorio, Shapiro & Shapiro, Hackensack, NJ, for Anthracite Glass Corporation.

Sheldon Rosenberg, Scranton, PA, for Shirley S. Feibus.

Sheldon Rosenberg, Scranton, PA, Morey M. Myers, Myers, Brier & Kelly, Scranton, PA, for Robert C. Statsman.

*MEMORANDUM*

CAPUTO, District Judge.

Presently pending before the court are cross-motions for summary judgment. Plaintiff filed this action for breach of contract alleging that defendants failed to meet their obligations under a Master Surety Agreement signed with the plaintiff. (Compl.¶¶ 1, 5.) Plaintiff filed a motion for summary judgment, seeking a) reimbursement for losses and expenses paid under the Master Surety Agreement, in the amount of $3,751,272.82 plus interest;[1] and b) specific performance for an order compelling defendants to deposit $3,241,592 with plaintiff to protect it against future losses and expenses. (Pl.'s Br. in Supp., Doc. 75 at 28, 32.) Defendants have also filed a motion for summary judgment asking that the court dismiss the complaint. (Defs.' Mot., Doc. 60.) Both motions are fully briefed and ripe for disposition. The court has jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332.

## BACKGROUND

On June 25, 1991, Steven J. Feibus, Lori M. Feibus, Anthracite Glass Co., Inc., Anthracite Plate Glass Co., Inc., Anthracite Glass Corp., Anthracite Window Corp., Luster-life, Inc., Shirley S. Feibus, and Samuel S. Feibus ("defendants" or "principals") entered into a Master Surety Agreement ("MSA") with United States Fidelity & Guaranty Co. ("plaintiff" or "surety"). (Compl. ¶ 2 .) A suretyship is a three-party relationship where the *surety* undertakes to perform to an *obligee*, if the *principal* fails to do so. Pursuant to the MSA, plaintiff issued certain performance and payment bonds to six different obligees for construction projects to be performed by defendants, Anthracite Glass Company, Inc., Anthracite Plate Glass Company, Inc. Anthracite Glass Corporation, An-

---

1. This amount represents only the claims paid by plaintiff up to December 31, 1996. (Pl.'s Br. in Supp. of M. for Summ.J. at 5.) Any payments made by plaintiff after this cut-off date will be covered under plaintiff's second claim, requesting specific performance for a collateral security deposit. *Id.*

Pursuant to the Master Surety Agreement, any liability of the defendants "shall include interest from date of [plaintiff's] payments at the maximum rate permitted in the jurisdiction in which this AGREEMENT is enforced...." (Compl.Ex. A ¶ IV(B)). The maximum rate permitted in Pennsylvania is six per cent per annum. 41 P.S. § 201, 202. Thus, plaintiff is entitled to interest at the rate of 6% from the time plaintiff made the payments on any prevailing claims.

thracite Window Corporation, and/or Luster-life, Inc. (the "Anthracite Companies").[2] *Id.* ¶ 3. The Anthracite Companies were eventually declared in default on five of the projects for which plaintiff had issued bonds.[3] *Id.* ¶¶ 19–20. In order to fulfill its obligations under the bonds, plaintiff was called upon to complete performance of the jobs under the performance bonds, and to pay numerous claims under the payment bonds.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that the moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 329, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving

party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323, 106 S.Ct. at 2552.

Furthermore, summary judgment is an appropriate method of resolving disputes concerning indemnification agreements. *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201 (5th Cir.1996); *Commercial Ins. Co. of Newark v. Pacific–Peru Constr. Corp.*, 558 F.2d 948 (9th Cir.1977); *Continental Cas. Co. v. American Sec. Corp.*, 443 F.2d 649 (D.C.Cir.1970).

## DISCUSSION

### I. PLAINTIFF'S LOSSES AND EXPENSES CLAIM

Plaintiff's case is based on breach of contract, specifically that defendants have

---

**2.** Plaintiff issued two different types of surety bonds in this case. "Performance bonds" were issued to assure the obligee that if defendants failed to perform their contractual obligations, plaintiff would discharge the obligations by either performing them or pay the obligee the excess costs of performance. Additionally, "payment bonds" were issued in order to guaranty that defendants' laborers, subcontractors and suppliers would be paid.

**3.** Defendants were declared in default by the following obligees: J.E. Merit Constructors, Inc., Manshul Construction Corp., Bhandari Constructors and Consultants, Inc., Turner Construction Co., and N.Y. City Health and Hopitals Corp. (Pl.'s Br. in Supp. Exs. 8–12.)

breached their obligations under the MSA. We will therefore start with the actual language of the MSA. Under the MSA, the defendants expressly agreed that:

> IV(A) the liability of [defendants] hereunder shall extend to and include all amounts paid by [plaintiff] in good faith under the belief that: (1) [plaintiff] was or might be liable therefor; (2) such payments were necessary or advisable to protect any of [plaintiff's] rights or to avoid or lessen [plaintiff's] liability or alleged liability . . .

> (C) the voucher(s) or other evidence of such payment(s) or an itemized statement of payment(s) sworn to by an officer of [plaintiff] shall be prima facie evidence of the fact and extent of the liability of [defendants]. . . .

(Compl.Ex.A.)

### A. *The Prima Facie Evidence Clause*

Under the MSA, submission of evidence of payments in the form of vouchers or affidavits shall be *prima facie* evidence of the fact and amount of liability. These *prima facie* evidence clauses have been upheld as not against public policy and enforced by the courts. *Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc.* 722 F.2d 1160, 1163. (4th Cir.1983) (applying Pennsylvania law); *Transamerica Ins. Co. v. Bloomfield,* 401 F.2d 357, 362 (6th Cir.1968); *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.,* 85 F.3d 201, 210 (5th Cir.1996).

Similarly, courts have granted summary judgment in favor of a surety based on such a provision. *See Gundle Lining,* 85 F.3d at 210; *Curtis T. Bedwell & Sons, Inc. v. International Fidelity, Ins.,* No. 83–5733, 1989 WL 55388 (E.D.Pa. May 23, 1989) (citing *Continental Cas. Co. v. American Sec. Corp.,* 443 F.2d 649 (D.C.Cir.1970)).

Although the M.S.A. § requires either vouchers or affidavits, plaintiff in this case has submitted both forms of evidence detailing its losses and expenses. Plaintiff submitted voluminous documentation of its payments as a result of its obligations under the performance and payment bonds. (Suppl.Decl. of Carl C. Coe, Jr., Doc. No. 89.) Additionally, plaintiff submitted itemized statements of each payment sworn to in Declarations by the three claims specialists responsible for handling these claims. (Decls. of Gary A. Wilson, Carl C. Coe, Elizabeth K. Stosur, Doc. Nos. 76, 77, 78.) The documents establish that plaintiff made payments in the amount of $3,751,272.82.[4] The evidence provided by plaintiff is more than what the M.S.A. § requires and more than what defendants promised to accept as *prima facie* evidence of both the fact and extent of liability. (Compl.Ex. A ¶ IV(C)).[5]

Under Rule 56, the moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988). According to the express language of the MSA, vouchers of payment or sworn declarations constitute *prima facie* evidence of the fact and amount of liability.

Interpreting identical *prima facie* evidence clauses, courts have routinely held that once a surety has submitted the required documentation of payments, the burden under Rule 56 shifts to the principal to prove the existence of a genuine issue of material fact for trial. *See, e.g., Gundle Lining,* 85 F.3d

---

4. This amount refers to payments made up to December 31, 1996. (*See supra* note 1.) The total also includes plaintiff's attorney fees and costs related to this action. Under the terms of the MSA, "in the event [plaintiff] should file suit at law or in equity to enforce the terms of this AGREEMENT, [plaintiff] shall be entitled to recover its own attorney's fees and expenses in connection with such suit." (Compl.Ex. A ¶ V.) Courts have consistently enforced these provisions in surety agreements. *Bristol Steel,* 722 F.2d at 1166 (applying Pennsylvania law); *Inter-*

*national Fidelity Ins. Co. v. United Constr., Inc.,* No. 91–2361, 1992 WL 111368 *3 (E.D.Pa. May 15, 1992); *General Ins. Co. of America v. Eastern Consolidated Utilities, Inc.,* No. 94–CV–4388, 1995 WL 428685 at *6 (E.D.Pa. July 18, 1995).

5. Defendants have not contested the validity of the amount plaintiff has paid. Instead, as discussed below, defendants argue that the payments should not have been made or were made in bad faith. (*See supra* part IB.)

at 210 (payment vouchers evidencing fact and amount of liability shifts burden under Rule 56 to principals); *Continental Cas. Co.*, 443 F.2d at 650–51 (photostats of canceled checks and sworn affidavits alone were sufficient to support the summary judgment granted by the district court); *Curtis T. Bedwell & Sons, Inc. v. International Fidelity Ins.*, No. 83–5733, 1989 WL 55388 at *3 (E.D.Pa. May 23, 1989) (submission of affidavits and supporting documentation of the expenditures made under the bonds was sufficient to shift the burden under Rule 56 to the non-moving party); *International Fidelity Ins. Co. v. United Constr., Inc.*, No. 91–2361, 1992 WL 46878 at *2 (E.D.Pa. March 4, 1992) (exhibits and affidavits detailing disbursements and expenses were sufficient to shift the burden under Rule 56(e) to the non-moving party).

In the present case, plaintiff has discharged its burden under Rule 56 by submitting both sworn declarations and supporting documentation of the payments plaintiff made. Plaintiff having satisfied its burden, the burden now shifts to defendants to prove a genuine issue for trial. Only if defendants can raise a genuine issue of material fact, can summary judgment be averted. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514.

## B. *Does the Language of the M.S.A. or the Bonds Control?*

█ Defendants do not dispute the validity of the MSA, nor the documentation supporting the payments made by plaintiff. Instead, defendants argue that the terms of the *bonds* are controlling, and not the language of the MSA. Defendants contend that plaintiff breached the bonds by making payments

it was not obligated to make and therefore any money paid by plaintiff was as a "volunteer." (Defs.' Opp'n Br. at 3, 9.) Under this argument, there would have to be *actual liability* under the bonds before plaintiff could make any payments to an obligee. The court is not persuaded by defendants' "volunteer" argument.

Under the common law, equity generally implies a right to indemnification in favor of a surety only when the surety pays off a debt for which his principal is liable. *Fidelity & Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir.1983) (applying Pennsylvania law) (citing *Com'l Ins. Co. of Newark v. Pacific–Peru Constr.*, 558 F.2d 948, 953 (9th Cir.1977)). However, resort to implied indemnity principles is improper when an express indemnification contract exists; when there is such an express contract, a surety is entitled to stand upon the letter of the contract. *Id.*

In the present case, the parties have signed an express contract. The plain language of the M.S.A. § provides that liability extends to payments made in *good faith* on the basis that plaintiff *might be liable;* or that payments were necessary to protect plaintiff's rights or *avoid or lessen* its liability or *alleged liability.* (Compl.Ex. A ¶ IV(A)) (emphasis added). Such language does not require that payments be made only in the face of actual liability under the bonds, as defendants contend.

Indeed, several courts interpreting surety agreements similar to the MSA, have rejected the argument proposed by the defendants.[6] *Bristol Steel,* 722 F.2d at 1163 (ap-

---

**6.** Defendants have relied solely on *General Ins. Co. of America v. K. Capolino Constr. Corp.*, to support their "volunteer" argument. 908 F.Supp. 197 (S.D.N.Y.1995). The court in *Capolino* held that when a principal alleges an obligee's default caused the principal's default, this creates a genuine issue of material fact as to whether the surety paid claims in good faith. *Id.* at 628. Defendants in this case similarly allege that the obligees were in default and therefore plaintiff was not required to make the payments under the bonds.

The court declines to follow the decision in *Capolino* which is contrary to the majority of the jurisdictions. *See Fidelity & Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d

1160, 1163 (4th Cir.1983); *Commercial Ins. Co. of Newark v. Pacific–Peru Constr. Corp.*, 558 F.2d 948, 951 (9th Cir.1977). *See also supra* discussion part I(B).

Further, the court notes that the same district court that decided *Capolino*, in a recent decision that cites *Capolino*, held that "it is irrelevant whether [the principal] was actually liable for the payments claimed by the subcontractors or actually defaulted ... so long as [the surety] acted in good faith in making the payments." *General Accident Ins. Co. v. Merritt–Meridian Constr. Corp.*, 975 F.Supp. 511, 516 (S.D.N.Y.1997). The court in *General Accident* went on to reject the identical "volunteer" argument made by the defendants in this case. *Id.* Thus, defendants'

plying Pennsylvania law) (under the letter of the contract, surety had the right to reimbursement for payments made in good faith, whether or not liability existed); *Commercial Ins. Co. of Newark v. Pacific–Peru Constr. Corp.*, 558 F.2d 948, 952 (9th Cir.1977) (argument that surety suffered no actual liability under its bond and was therefore a "volunteer" provided no defense to indemnification under the express language of the surety agreement); *Fireman's Fund Ins. Co. v. Nizdil*, 709 F.Supp. 975, 977 (D.Or.1989) (indemnification depends upon interpretation of the indemnity contract and not on the validity or enforceability of the bond); *United States for the Use of Int'l Brotherhood of Electrical Workers v. United Pacific Ins. Co.*, 697 F.Supp. 378, 381 (D.Idaho 1988) (defendant cannot escape liability by arguing he did not sign the bond when he did sign the surety agreement which is the document in question); *Employers Ins. of Wausau v. Able Green, Inc.*, 749 F.Supp. 1100, 1103 (S.D.Fla.1990) (surety is entitled to reimbursement for payments made in good faith, regardless of whether any liability actually existed).

█ Defendants contend that paragraph III of the M.S.A. § supports their argument that there must be actual liability under the bonds before a surety can settle any claims. Paragraph III of the M.S.A. § provides:

> [defendants] shall exonerate, indemnify, and keep indemnified [plaintiff] from and against any and all liabilities, losses and expenses of whatsoever kind or nature ... imposed upon, sustained, or incurred by [plaintiff] by reason of: (1) [plaintiff] having executed, provided or procured BOND(S)....

(Compl.Ex. A ¶ III).

Defendants argue that the language "by reason of ... having executed ... BOND(S)" means that there must be *actual liability under the bonds* in order for defendants to be liable under the MSA. Defendants' interpretation would render paragraph IV(A), that defendants are liable for any amounts paid by plaintiff in good faith, meaningless. The language in paragraph III is standard in

surety agreements and simply defines the scope of the M.S.A. § to apply only to payments made as a result of the procurement or execution of the bonds. *See, e.g., Transamerica Ins. Co. v. Bloomfield*, 401 F.2d 357, 362 (6th Cir.1968); *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 210 (5th Cir.1996); *General Ins. Co. of America v. Eastern Consolidated Utilities, Inc.*, No. 94–CV–4388, 1995 WL 428685 *4 (E.D.Pa. July 18, 1995).

█ Defendants also attempt to use paragraph VI of the M.S.A. § to support their argument that actual liability under the bonds is necessary. Paragraph VI of the M.S.A. § provides:

> (A)(1) The [plaintiff] has the right of Exoneration and Subrogation; and (2) [plaintiff's] rights of Exoneration and Subrogation may be enforced as provided by applicable law or, at option of [plaintiff], as follows: ... (a)(ii) the payment of obligation(s) to subcontractor(s), laborer(s) and supplier(s) of material(s) and service(s) incurred or to be incurred in the performance of the contract for which [plaintiff] is liable under BOND(S)....

(Compl.Ex. A ¶ VI(A)(1)).

Defendants argue that the language "for which plaintiff is liable under BOND(S)" stands for the proposition that plaintiff could only make payments in the face of actual liability. Defendants take the language of paragraph VI out of context. The purpose of paragraph VI is to protect plaintiff's rights of exoneration and subrogation. Accordingly, the language ensures that plaintiff's rights of exoneration and subrogation can be enforced as a result of the payment of obligation(s) to subcontractor(s), laborer(s) and supplier(s) of material(s) and service(s) incurred as a result of the performance of the contract for which the bonds were provided. Paragraph VI therefore is descriptive of the plaintiff's rights of exoneration and subrogation, which extends to cover payments incurred in performance of the contract. It is not a description of liability under the MSA.

The court understands the danger in holding a principal liable for payments made by a

reliance on *Capolino* to support their "volunteer"      argument is misplaced.

surety on a good faith basis, when there may be no actual liability. However, the court notes that such good faith clauses, while harsh, are typical in surety agreements and have routinely been upheld. *Bristol Steel,* 722 F.2d at 1163; *Continental Cas. Co. v. American Sec. Corp.,* 443 F.2d 649 (D.C.Cir. 1970); *Gundle Lining,* 85 F.3d at 201; *International Fidelity Ins. Co. v. United Constr., Inc.,* No. 91–2361, 1992 WL 46878 (E.D.Pa. March 4, 1992).

Sureties enjoy such discretion to settle claims because of the important function they serve in the construction industry. The purpose of good faith clauses is to facilitate the handling of settlements by sureties and protect them from unnecessary and costly litigation. *See Transamerica,* 401 F.2d at 363. It is believed that "the expense, delay, trouble, and risk of loss to the [surety] is a sufficient safeguard against an unwarranted payment." *Engbrock v. Federal Ins. Co.,* 370 F.2d 784, 786 (5th Cir.1967).

■ Of course, under such a provision the surety is not entitled to reimbursement for any payments made "through fraud or lack of good faith." *Bristol Steel,* 722 F.2d at 1163. Courts have recognized that the one exception to enforcement of a principal's liability for a surety's disbursement is bad faith or fraudulent payment. *See id.; Engbrock,* 370 F.2d at 786; *International Fidelity Co. v. United Constr., Inc.,* No. 91–2361, 1992 WL 46878 *2 (E.D.Pa. March 4, 1992). Thus, a claim of fraud or bad faith acts as a defense and, if properly supported, creates a genuine issue of material fact. Defendants have made several allegations that the plaintiff in this case acted in bad faith.

C. *Application of the Good Faith Standard*

■ Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. *Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 751 (3d Cir.1994) (citing Black's Law Dictionary 139 (6th ed.1990)). Thus, a lack of diligence or negligence is not the equivalent of bad faith, indeed even gross negligence cannot support a finding of bad faith. *See Klinger*

*v. State Farm Mut. Auto. Ins. Co.,* 895 F.Supp. 709, 713 (M.D.Pa.1995); *Terletsky v. Prudential Prop. and Cas. Ins. Co.,* 437 Pa.Super. 108, 125, 649 A.2d 680, 688 (1994). Bad faith requires a showing of recklessness or improper motive such as self-interest or ill will. *Polselli,* 23 F.3d at 751; *Klinger,* 895 F.Supp. at 713.

■ Defendants first contend that the fact that plaintiff made payments when it knew defendants were not in default is evidence of bad faith. (Defs.' Opp'n Br. at 18.) Plaintiff contests the fact that it had actual knowledge that any of the defaults against defendants were improper. Plaintiff further argues that, regardless, it had the right under the M.S.A. § to make payments in good faith to avoid or lessen its liability. Defendants' position strikes the court as a recasting of defendants' argument that unless there is liability on the bond, there is no liability under the MSA. It is precisely for this reason that in order to prevail defendants must demonstrate that the payments were made in bad faith. The court reiterates the fact that the express language of the M.S.A. § permits plaintiff to settle claims based on a good faith belief that such payments are "necessary or advisable to protect any of [plaintiff's] rights or to avoid or lessen [plaintiff's] liability...." (Compl.Ex. A ¶ IV(A)).

In *Bristol Steel,* a case decided by the Fourth Circuit applying Pennsylvania law, the surety initially relied on the principal's denial of default and denied liability. 722 F.2d at 1164. The obligee, the Pennsylvania Department of Transportation ("PennDOT"), subsequently declared the surety in default and "blacklisted" it from working as a surety on any future contracts with PennDOT. *Id.* In order to resume writing surety bonds for road work in Pennsylvania, the plaintiff settled the claims with PennDOT. *Id.* The Fourth Circuit found that there was "no justification for a finding of bad faith or fraud simply because [the surety] made the payment to secure their removal from PennDOT's blacklist." *Id.* at 1165. In making this determination, the court relied on the fact that under Pennsylvania law, the principal under a surety agreement is "bound not simply to indemnify the surety but to keep it

unmolested, and this before the surety has paid the principal's debt." *Id.* (quoting *Almi. Inc. v. Dick Corp.*, 31 Pa.Cmwlth. 26, 375 A.2d 1343, 1348 (1977)).

Other jurisdictions have similarly upheld a surety's right to indemnification for claims paid to protect its own interests, as long as the payments were made in good faith. *See Gundle Lining*, 85 F.3d at 210 (when principal refused to cooperate, surety did not act in bad faith in settling claim under the best possible terms, even though it had initially refused to pay the claim); *Able Green*, 749 F.Supp. at 1103 (surety's decision to forgo litigation and settle claims is not evidence of bad faith where litigation would far exceed the expense of settling the claims).

The defendants in this case were declared in default on five different construction projects. After the defaults, plaintiff attempted to work with defendants in completing the projects and defendants were less than cooperative in settling the disputes.[7] Plaintiff subsequently received claims totaling over $3.7 million and defendants refused to reimburse plaintiff for even one of these claims.[8]

Additionally, under the language of the MSA, from the moment defendants were declared in default, plaintiff was entitled to receive funds in an amount sufficient to protect plaintiff from future losses. (*See supra* part II.) Defendants ignored repeated requests by the plaintiff to provide collateral security against these claims. Courts have held that a principal's failure to deposit collateral security, in violation of a surety agreement, weighs against a finding that the surety acted in bad faith in settling claims. *See Bristol Steel*, 722 F.2d at 1164; *Able Green*, 749 F.Supp. at 1103. Given the factors discussed above, the court finds that defendants have not raised a genuine issue of material fact regarding their allegation that plaintiff settled these claims in bad faith.

Defendants next argue that plaintiff refused to communicate with defendants concerning the claims and this "blackout period" is evidence of bad faith. (Defs. Opp'n Br. at 20.) The M.S.A. § does not require the plaintiff to consult with the defendants prior to settling any claims. The fact that a surety makes payments without giving notice to the principal is not evidence of bad faith. *See Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 719 (5th Cir.1995); *United States for the Use of Int'l Brotherhood of Electrical Workers v. United Pacific Ins. Co.*, 697 F.Supp. 378, 381 (D.Idaho 1988). Additionally, plaintiff has submitted copies of numerous letters sent to defendants during the alleged "blackout period."[9] (Suppl.Decl. of Carl C. Coe,

---

7. The testimony of defendant, Steven Feibus, demonstrates a less than cooperative attitude in working with plaintiff's employees after the defaults:

Q: Do you remember any specific comments?
A: Well, on more than one occasion I told Carl and some of the consultants and I don't remember who else, pardon my French, to go fuck themselves after they did certain things and comments that were made and everything else.
Q: And you were referring to Mr. Coe; is that correct, Carl Coe?
A: Amongst others'....
Q: Now, were these comments made during the course of discussions relating to completion of the jobs?
A: They were made when there was discussions as to how they were going to do jobs or how—what they were going to do or why they should do them. Or even when they called me and said, what should we do here or what should we do there, and I give them my opinion, and they tell me, well, we're going to do it another way, and I'd say, why the hell did you ask me for my opinion?

(Transcript of Steven F. Feibus, Doc. 68 at 65–66.)

8. During plaintiff's attempt to resolve these claims, Mr. Feibus himself testified that he informed plaintiff he would not pay plaintiff for any of the claims:

[a]nd as an attempt to try to go back to where I was in respect to having a relationship and working things out and mutually helping each other resolve problems that did exist, that seemed to be waning rapidly, and I basically told them, then screw you, I ain't going to pay you a goddamn dime. You're not going to get any money out of me if that's the way you're going to be. And I did that as a way of trying to get them to come back to the other side and work with me, and evidently I failed.

(Transcript of Steven F. Feibus, Doc. 75, Ex. 2 at 116.)

9. Plaintiff claims it insisted all correspondence with defendants be in writing because of defendants' prior uncooperative attitude toward plaintiff's employees. (*See supra* note 7.) (Pl.'s Reply Br., Doc. 89 at 21.)

Jr. Ex. D, Doc. No. 89.) Defendants have not contested the validity of these letters. Consequently, the allegations of a "blackout period" do not support a finding of bad faith on the part of the plaintiff.

Finally, defendants argue that plaintiff acted in bad faith by making excessive payments and failing to investigate claims. (Defs. Opp'n Br. at 7, 20.) Specifically, defendants claim that plaintiff paid $73,960 for storage and engineering charges which were not required by the contract; and $15,641 for a change order that did not exist. (Defs.' Mot. for Summ. J. at 5.)

Bad faith requires a showing of dishonest purpose or improper motive. *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F.Supp. 709, 713 (M.D.Pa.1995). Gross negligence or bad judgment is insufficient to amount to bad faith. *Id.* at 714. Defendants have not submitted any evidence that plaintiff made these payments because of an improper motive or purpose. Moreover, some courts have held that allegations of excessive payments do not rise to the level of bad faith. *See, e.g., Engbrock v. Federal Ins. Co.*, 370 F.2d 784, 785–87 (5th Cir.1967) (allegation that surety made excessive payments at most alleges negligence); *Fireman's Fund Ins. Co. v. Nizdil*, 709 F.Supp. 975, 976–77 (D.Or.1989) (allegation that surety overpaid claim failed to raise an issue of material fact that would preclude summary judgment).

Nevertheless, plaintiff has provided uncontradicted testimony to the effect that: it paid these charges in order to receive windows which were necessary to proceed with the project; plaintiff had explored other possibilities and it would have cost more to use an alternative supplier, and the project contained a liquidated damages clause providing for $3,500 a day. (Pl.'s Reply Br., Doc. 88, Ex. E at 136, 166, 176.) As discussed above, evidence that a surety paid claims to lessen its own liability does not support a finding of bad faith. *See Bristol Steel*, 722 F.2d at 1166 (applying Pennsylvania law) (surety who paid claims simply to remove themselves from the obligee's "blacklist" did not support a finding of bad faith); *Employers Ins. of Wausau v. Able Green, Inc.*, 749 F.Supp. 1100, 1103 (S.D.Fla.1990) (decision to pay claim to forgo

litigation is not evidence of bad faith where litigation would far exceed the expense of settling the claims); *American States Ins. Co. v. Glover*, No. 91–5289, 1992 WL 78786 *4 (6th Cir.1992) (per curiam) (surety's failure to mitigate losses is not a defense to an indemnity action). Thus, even if these payments were excessive, the fact that plaintiff made the payments in order to lessen its liability does not rise to the level of bad faith. Accordingly, defendants have failed to raise a genuine issue of material fact that plaintiff acted in bad faith in making these payments. (*See supra* part IA.)

Under the MSA, submission of evidence of payments in the form of vouchers or affidavits is *prima facie* evidence of the fact and amount of liability. *Id.* Interpreting identical *prima facie* evidence clauses, courts have routinely held that once a surety has submitted the required documentation of payments, the burden under Rule 56 shifts to the principal to prove the existence of a genuine issue of material fact for trial. *See Gundle Lining*, 85 F.3d at 210; *Continental Cas. Co.*, 443 F.2d at 650–51; *Curtis T. Bedwell & Sons, Inc. v. International Fidelity Ins.*, No. 83–5733, 1989 WL 55388 at *3 (E.D.Pa. May 23, 1989); *International Fidelity Ins. Co. v. United Constr., Inc.*, No. 91–2361, 1992 WL 46878 at *2 (E.D.Pa. March 4, 1992).

Defendants in the present case have failed to create a genuine issue of material fact for trial. In the absence of contravening evidence from the defendants, the plaintiff's submission of detailed expense reports as well as sworn declarations demonstrating good faith in making such payments, is sufficient to prevail on a motion for summary judgment. Accordingly, the court will grant plaintiff's motion for summary judgment on plaintiff's first claim for reimbursement of losses and expenses. The court will now proceed to address plaintiff's second claim, requesting specific performance of a collateral security deposit.

## II. PLAINTIFF'S SPECIFIC PERFORMANCE CLAIM

Plaintiff's second claim requests a decree of specific performance compelling defendants to deposit sufficient funds with

plaintiff in accordance with the M.S.A. § to protect plaintiff against future losses. (Pl.'s Br. in Supp., Doc. No. 75 at 29.) The M.S.A. § provides:

> in order to exonerate or indemnify [plaintiff], [defendants] shall upon demand of [plaintiff], place [plaintiff] in funds before [plaintiff] makes any payments; ... (The amount of such money or property or the value of the property to become subject to liens or security interests, shall be determined by [plaintiff].)

(Compl. Ex. A ¶ III(B)).

Under a collateral security provision like the one included in the MSA, once a surety receives a demand on its bond, the principal must provide the surety with funds which the surety is to hold in reserve. *Safeco Ins. Co. of America v. Schwab*, 739 F.2d 431, 433 (9th Cir.1984). If the claim on the bond must be paid, then the surety will pay the loss from the principal's funds; otherwise, the surety must return the funds to the principal. *Id.* Thus, there is no windfall for the surety. *See American Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 300 (2d Cir.1989).

These collateral security clauses have routinely been upheld. *Tennant v. United States Fidelity & Guaranty Co.*, 17 F.2d 38 (3d Cir.1927); *United Bonding Ins. Co. v. Stein*, 273 F.Supp. 929 (E.D.Pa.1967); *American Motorists*, 876 F.2d at 293. The rationale is that "[i]f a creditor is to have the security position for which he bargained, the promise to maintain the security must be specifically enforced." *Safeco*, 739 F.2d at 433. Thus, in order to protect the surety's bargain, courts have granted specific performance to enforce collateral security provisions. *See Tennant*, 17 F.2d at 38; *Stein*, 273 F.Supp. at 930; *Safeco*, 739 F.2d at 433.

Under the language of the MSA, the only conditions precedent to defendants' obligation were the plaintiff's estimate that a reserve was necessary and its demand upon defendants. *Stein*, 273 F.Supp. at 929–30. "Once these conditions are fulfilled equity will specifically enforce such a promise where, as in the instant case, a legal remedy for subsequent damages would not suffice." *Id.* 930 (citing *American Cas. Co. of Reading v. Ridgeway Constructors, Inc.*, 23 Pa.D. & C.2d 43 (1961))..

In response to numerous claims, plaintiff in this case determined that a reserve was necessary and made repeated demands upon defendants to place funds with the plaintiff to protect it against future losses. Contrary to the express language of the MSA, defendants ignored plaintiff's requests. In the briefs and documents submitted, defendants have failed to contest plaintiff's claim for specific performance. We therefore find that defendants have failed to raise an issue of material fact that would prevent the court from entering summary judgment on plaintiff's claim for specific performance. Thus, plaintiff is entitled to specific performance compelling the defendants to deposit $3,241,592 with the plaintiff to protect plaintiff against future losses and expenses.

An appropriate order will follow.

### ORDER

NOW, this 8th day of May, 1998, upon consideration of plaintiff's Motion for Summary Judgment and consistent with the accompanying Memorandum, it is HEREBY ORDERED that said Motion is GRANTED and JUDGMENT is entered in the above case for plaintiff and against defendants in the amount of $3,751,272.82 plus interest thereon at the rate of 6% per annum from the time of payments. It is further ORDERED that defendants shall deposit with plaintiff the amount of $3,241,592 as a reserve to be used by plaintiff against future losses. Defendants' Motion for Summary Judgment is therefore DENIED.