**TRANSAMERICA INSURANCE COMPANY, Plaintiff-Appellant,**

v.

**Harry BLOOMFIELD, Defendant-Appellee.**

No. 18091.

United States Court of Appeals
Sixth Circuit.

Sept. 30, 1968.

**358**

James S. Gilliland, Memphis, Tenn., for plaintiff-appellant; Montedonico, Gilliland, Heiskell, Davis, Canale & Glankler, Memphis, Tenn., of counsel.

Olen C. Batchelor, Jr., Memphis, Tenn., for defendant-appellee; Holt, Batchelor, Taylor, Spicer & Hoffman, Memphis, Tenn., of counsel.

Before WEICK, Chief Judge, and O'SULLIVAN and CELEBREZZE, Circuit Judges.

WEICK, Chief Judge.

Plaintiff has appealed from a judgment entered upon a directed verdict in favor of the defendant.

The action in the District Court was instituted by Transamerica Insurance Company, successor by merger to American Surety Company of New York, against the defendant, Harry Bloomfield, to recover $52,875.90 on an indemnity agreement which he executed on May 12, 1960, to indemnify and save harmless the surety on account of a labor and material payment bond which it furnished at his request in connection with a contract for the construction of seventy-four houses at Palo de Pan, Ponce, Puerto Rico.

Jurisdiction was based on diversity of citizenship.

The Contractors (principals on the bond) were two companies, Inter-American Builders, Inc. and Constructora de

Ponce, Inc., engaged in the construction business in Puerto Rico.

The contract for construction of the houses had been entered into on March 18, 1960, between The Puerto Rico Teachers Association, a nonprofit corporation, and Constructora de Ponce, Inc. and Inter-American Builders, Inc. as joint adventurers, with principal office in Santurce, Puerto Rico. The contractors agreed to construct seventy-four houses for the Teachers Association, of which forty units, covered by FHA commitments, were to be completed not later than September 1, 1960, and the remaining thirty-four units by October 30, 1960.

The Teachers Association agreed to pay the contractors $539,945 in partial payments on the first and fifteenth of each month "on each house as follows: Payment Schedules In Accordance With Standard FHA Approved Payments."

The contractors agreed to furnish to the Teachers Association, upon receipt of notice to proceed, a performance bond in the amount of fifty per cent of the amount of the contract and a second bond for fifty per cent of the amount of the contract upon completion of one-half of the total project, or on July 15, 1960, whichever occurred first.

In order to induce the surety to execute the first bond for fifty per cent of the contract price, the contractors and their shareholders executed the indemnity agreement upon which this suit was brought [1].

Paragraph 3 of the application for the bond described the work as follows:

"3.  Give concise description of proposed work and location. Construction of 37 houses at Palo de Pan, Ponce, Puerto Rico."

Construction was started on the houses but the contractors did not furnish the second bond required to be furnished when one-half of the houses were built, or on July 15, 1960. The Teachers Association permitted the contractors to proceed with construction of all seventy-four houses, thereby waiving the requirement for the additional bond. No notice was given to the surety that the additional bond required by the contract had not been furnished.

Unpaid claims for labor and material furnished in the construction of the houses were filed with the surety and it employed an auditing and adjusting firm to investigate. On October 9, 1961 the surety wrote to Bloomfield, advising him that the claims aggregated $99,365,

1.  The pertinent provisions of the indemnity agreement are as follows:

"III.  That the Indemnitor will perform all the conditions of the bid and/or contract bond herein, and any and all alterations, modifications, renewals, continuations, and extensions thereof, and will at all times indemnify and save the Company harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee (including fees of special counsel whenever by the Company deemed necessary), expense, suit, order, judgment and adjudication whatsoever, and any and all liability therefor, sustained or incurred by the Company by reason of having executed or procured the execution of said bond or bonds, and will place the Company in funds to meet the same before it shall be required to make payment, and in case the Indemnitor requests the Company to join in the prosecution or defense of any legal proceeding, the Indemnitor will, on demand of the Company, place it in funds sufficient to defray all expenses and all judgments that may be rendered therein.

*      *      *      *      *

"VI.  That this agreement shall cover the bond or bonds above recited and any and all alterations, modifications, renewals, continuations, and extensions thereof. The Company is hereby authorized to assent to any changes in or modifications of the contract, plans, specifications, bond or bonds without notice to or the request of the Indemnitor. That the Company shall have the right to pay, settle or compromise any expense, claim or charge of the character enumerated in this agreement, and the voucher or other evidence of such payment shall be prima facie evidence of the propriety thereof and of the Indemnitor's liability therefor to the Company."

and made demand on him to place it with funds to meet all proper claims.

A number of suits on the claims for materials were filed in Puerto Rico against the contractors and the surety. In defense of the suits the surety was required to and did employ attorneys and an accountant. It litigated one of the claims for material, namely, Bonnin and Cia. It interposed the defense that its bond covered only the first thirty-seven houses built, and that claimant's evidence did not show on which of the houses the materials were furnished. The court rejected this defense and rendered judgment against the surety in the amount of $2,925.38. The surety paid the judgment.

Acting under the authority contained in the indemnity agreement, the surety effected settlement of the suit of Lausell Aluminum Jalousies for $3,800, which involved a claim of $7,195.50. It successfully defended the suit brought by Ponce Terazzo for $4,154.45, but in so doing incurred expense for attorney's and investigator's fees and costs. It resisted a wage claim of Salvator Natal with the Puerto Rican Department of Labor. Natal was night watchman for the project. The Department ordered the surety to pay him $562.10, and the surety complied. It compromised the suit of Garcia Commercial, Inc. for $37,641, which involved a claim in the amount of $41,871.-77. This claim was compromised as part of a settlement involving the bond in question and bonds which the surety had furnished for the contractors in connection with other projects. The surety thus expended $41,941 in settlement of claims, $3,487.48 in payment of the judgment and order, and $7,447.42 for costs, fees and expenses, making total payments in the amount of $52,875.90, which it sought to recover from Bloomfield in the present case.

Bloomfield, in his answer, admitted the execution of the indemnity agreement, but denied that the contractors were indebted to claimants for labor and material in connection with construction of the thirty-seven houses, and denied that he was indebted to the surety in any sum whatsoever.

At the trial, Melville Hall, Bond Claim Manager of the surety, identified and there was received in evidence the contract with the Teachers Association, the application for the bond containing the indemnity agreement, the bond, invoices of claimants, statements of attorneys for legal fees, and cancelled checks in payment or settlement of the claims, judgment, fees, costs and expenses. The checks and records submitted in connection therewith identified the bond number. Letters to Bloomfield were also received in evidence.

Mr. Hall and Kurt Rock, of McClary Corporation, a firm of surety consultants employed to investigate the claims, testified as to the various problems with which the surety was confronted, and the settlement and payment of the claims.

■ Mr. Rock undertook to testify that he examined the books and records of the contractors in Puerto Rico in an effort to prove that they supported the claims which had been asserted by the claimants, but the District Court rejected such evidence on the ground that it was hearsay and not the best evidence. In this, we are of the opinion that the District Court erred. We think the evidence was admissible as an admission against interest of the contractors. The surety was not required to produce the books of its principals, the contractors. Bloomfield had testified that his company[2] was a "dummy corporation" and it should be assumed that he was familiar with its books and could produce them himself if he so desired. Bloomfield was no stranger to the transaction. As owner of all the capital stock of his one-man corporation, he was beneficially interested in the construction contract. Furthermore, the contractors, or joint adventurers as they were described in

---

2. Bloomfield owned all of the capital stock of Constructora de Ponce, Inc., in which he had invested $1,000.

the contract, were parties to the suits filed in Puerto Rico against the surety.

Rock also testified that he exhibited the invoices of the claimants to Elton Larkin, then acting as president of Constructora de Ponce, Inc., who was living in Puerto Rico at the time and was in charge of the company's affairs. He had signed the construction contract as president. Rock testified that Larkin said: "Offhand they [the invoices] look substantially all right," but added that he might want to look them over again.

Mr. Rock also detailed the settlement negotiations with Garcia Commercial, Inc., in which the problem of allocation of the claim to specific houses was discussed. Garcia contended that the contract with the Teachers Association called for a fifty per cent bond which did not relate to specific houses; that the payments made to Garcia in the course of construction were not earmarked; and that it had the right to apply the payments in any manner it saw fit.

Over the objection of plaintiff and on the theory that the contract was ambiguous, the court permitted Bloomfield to testify that he indemnified only the first thirty-seven houses and had no intention of going into the second thirty-seven until the first were completed. In our opinion, this oral testimony conflicted with the contract with the Teachers Association, which was complete and unambiguous and required the contractors to construct seventy-four houses.

In directing a verdict for defendant at the close of all of the evidence, the District Court ruled that the contract was ambiguous; that the bond should be construed to apply only to the first thirty-seven houses; that the surety was required to prove that the judgment and claims which it paid or settled were for materials or labor furnished for construction of the first thirty-seven houses completed; and that since the evidence did not indicate to what houses the claims related, there was a failure of proof. In so ruling, the District Court placed an impossible burden on the sure-ty and did not give effect to the indemnity agreement.

The contract with the Teachers Association required the contractors to construct seventy-four houses, not thirty-seven. The first bond required was for fifty per cent of the contract price. It is true that the application for the bond described the work as "Construction of 37 houses at Palo de Pan, Puerto Rico." The bond, however, by express provision, made the contract with the Teachers Association a part of it by reference. The application for the bond was not made a part of the bond.

■ There was no ambiguity in the contract with Teachers Association or in the bond. If any ambiguity existed it was only in that part of the application for the bond which described the work as "37 houses" instead of stating that it was for seventy-four houses, and that the bond was for one-half of the contract price. Any ambiguity in the application was made clear upon examination of the contract which called for the construction of seventy-four houses. In any event, the liability of the surety to the claimants is determined by the provisions of the contract and bond, not by the application for the bond.

■ Construing the contract and bond together, it is clear that the surety was liable to claimants who furnished labor or material on any of the houses to the extent of fifty per cent of the contract price.

There was no proof as to which of the houses were completed first. The contract defined completion as occurring when a written certificate of occupancy was issued to the Association by its Resident Inspector after satisfactory evidence had been furnished that all bills for labor and material had been fully paid. The record does not disclose the existence of any such certificate. It is unlikely that the certificate would have been issued since all the bills for labor and material have not been paid. Hence none of the houses could have been considered completed.

The bond was not executed until May 12, 1960. The contract provided for furnishing of the first bond after the Teachers Association had given the contractors notice to proceed. The second bond was required to be furnished not later than July 15, 1960. It is unlikely that thirty-seven houses were built in a period of two months. Bloomfield did not identify which of the seventy-four houses had been built first. Nor did he furnish any evidence as to the houses on which work had been started first. The probabilities are that most of the claimants had furnished materials or labor on all of the houses.

■ In suits filed by materialmen or laborers against the surety, the contract with the Teachers Association and the bond were admissible in evidence. They were clear and unambiguous. The application for the bond would have been inadmissible in evidence to vary the terms and conditions of either the bond or the contract.

It is clear to us that the surety could not successfully defend the suits filed against it on the ground that the claims had to relate to the first thirty-seven houses completed and this undoubtedly motivated it to make the settlements after losing the Bonnin and Cia case.

■ In our opinion, there was no ambiguity in the indemnity agreement. In clear language, in paragraph III, the indemnitor (Bloomfield) agreed to

"* * * indemnify and save the Company harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee * * * expense, suit, order, judgment and adjudication whatsoever, and any and all liability therefor, sustained or incurred by the Company by reason of having executed or procured the execution of said bond or bonds. * * *"

Paragraph VI granted to the Company "* * * the right to pay, settle or compromise any expense, claim or charge of the character enumerated in this agreement, and the voucher or other evidence of such payment shall be prima facie evidence of the propriety thereof and of the Indemnitor's liability therefor to the Company."

The language in paragraph VI, "of the character enumerated in this agreement" obviously referred to those mentioned in paragraph III.

There can be no question concerning the judgment rendered against the surety in Puerto Rico. In the present case the surety was not required to go behind the judgment and relitigate the claim. The surety was authorized to incur expense for investigating and defending the claims asserted against it and to employ accountants, attorneys and investigators to perform this service.

The surety had the right to settle and compromise the claims which were asserted against it but in so doing it was required to act in good faith. The uncontroverted evidence in this case demonstrated that the surety did act in good faith.

■ Provisions in indemnity agreements granting to the indemnitor the right to compromise and settle claims, and providing that vouchers and other evidence of payment shall be prima facie evidence of the propriety thereof, have been upheld as not against public policy and enforced by the courts.

In National Surety Corp. v. Peoples Milling Co., 57 F.Supp. 281, 282–283 (W.D.Ky., 1944), our late colleague, the Honorable Shackelford Miller, Jr., in writing the opinion as a District Judge, said:

"This provision of the contract expressly gave the National Surety Corporation the right to adjust or settle the claim asserted by the Commodity Credit Corporation. It is well settled, even without a contract provision so authorizing, that a surety may discharge the obligation of the principal without waiting for suit to be filed against him, and be entitled to look to the principal for reimbursement. Huffman v. National Surety Company, 244 Ky. 714, 716, 51 S.W.2d 950. If the surety or the indemnitee has the

legal right to adjust or settle the claim, either by reason of the terms of his contract or because of actions on the part of the indemnitor, it is only necessary that such an adjustment or settlement be a reasonable one and made in good faith."

To the same effect are: American Surety Co. of N.Y. v. Inmon, 187 F.2d 784 (5th Cir. 1951); Carroll v. National Surety Co., 58 App.D.C. 3, 24 F.2d 268 (1928); National Surety Corp. v. Buckles, 31 Tenn.App. 610, 219 S.W.2d 207 (1948). Cf. Moses Ecco Co. v. Ros-Coe-Ajax Corp., 115 U.S.App.D.C. 366, 320 F.2d 685 (1963).

Some courts have even gone so far as to uphold provisions that vouchers and other evidence of payment shall be conclusive of the propriety of payment. Engbrock v. Federal Ins. Co., 370 F.2d 784 (5th Cir. 1967); United States Fid. & Guar. Co. v. Jones, 87 F.2d 346 (5th Cir. 1937).

The purpose of clauses in indemnity agreements of the type here involved is to facilitate the handling of settlements by sureties and obviate unnecessary and costly litigation.

In sum, the jury should have been instructed to return a verdict in favor of plaintiff, instead of defendant, for the amounts paid on the judgment and labor claim totaling $3,487.48; for costs, fees and expenses in the amount of $7,447.42; and for unallocated settlements in the amount of $4,300. On remand, the District Court will enter judgment in favor of plaintiff for these amounts, plus interest and costs.

The only issue left for determination on the remand is the amount of the payment made by the surety to Garcia Commercial, Inc. in settlement of all of its claims (those on the bond involved herein and bonds on other projects) which is reasonably attributable to the surety's liability to it on the labor and material payment bond involved in the present case and to enter judgment therefor. This issue was not determined at the trial in view of the disposition made of the case by the District Court.

Reversed and remanded for further proceedings in conformity with this opinion.