822 A.2d 1257

**ULICO CASUALTY COMPANY,**

v.

**ATLANTIC CONTRACTING & MATERIAL COMPANY, INC.**

No. 796, Sept. Term 2002.

Court of Special Appeals of Maryland.

May 5, 2003.

678

Eric R. Stanco (Stanco & Associates on the brief), Washington, DC, for appellant.

George Harper, of Upper Marlboro, for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER and SHARER, JJ.

DEBORAH S. EYLER, Judge.

In the Circuit Court for Prince George's County, Ulico Casualty Company ("Ulico") sued Atlantic Contracting & Material Company, Inc. ("Atlantic"), on an indemnity agreement that Atlantic gave Ulico in connection with Ulico's issuance of a performance and payment surety bond. Ulico sought to recover monies it had paid on a claim made on the surety bond and the attorneys' fees, costs, and expenses it had incurred in pursuing recovery from Atlantic. The case was tried to the court, which awarded Ulico some but not all of the monies it sought.

Neither party is satisfied with the court's ruling. Ulico, the appellant and cross-appellee, contends the court should have reimbursed it fully for the monies it paid on the claim and the full amount of its attorneys' fees, costs, and expenses. Atlantic, the appellee and cross-appellant, contends the court should not have found it liable at all.

For the following reasons, we shall reverse the judgment of the circuit court and remand the case for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

On June 27, 1997, Gilbert Southern Corporation ("Gilbert") entered into a general contract with the State of North Carolina Department of Transportation to repair a segment of the northbound lanes of Interstate 85 ("the Project"). Soon thereafter, Gilbert and Atlantic entered into a subcontract for Atlantic to perform the concrete paving work on the Project.

On September 2, 1997, Ulico issued a "Performance and Payment Bond" ("Bond") on behalf of Atlantic, as principal, in favor of Gilbert, as obligee, under the general contract for the Project. The Bond guaranteed Atlantic's performance of its duties under the subcontract and its prompt payment "to all persons supplying [Atlantic] with labor and materials in the prosecution of the work provided for in [the subcontract between Gilbert and Atlantic] ... and [the prompt payment

of] all other obligations incurred by [Atlantic] in connection with such work. . . ."

In partial consideration for the issuance of the Bond, Atlantic and its individual owners, John Madden and Thomas Madden, executed a General Agreement of Indemnity and Security ("Indemnity Agreement"), in favor of Ulico.

On June 24, 1998, a representative of Clearwater Hydraulics & Driveshaft Service ("Clearwater") informed Ulico by telephone that Clearwater had billed Atlantic for $21,843.48 in repairs to equipment Atlantic was using in connection with the Project but Atlantic had not paid Clearwater's bill. Clearwater was looking to Ulico, as Atlantic's surety, for payment. A representative of Ulico sent Clearwater a Proof of Claim form and a letter requesting that it submit the form and supporting documentation for its claim.

On July 28, 1998, Malcolm F. Bailey of Clearwater executed the Proof of Claim, under oath, stating that Atlantic owed Clearwater $21,843.48 for "repair to equipment used on paving job at I–85 North, Granville County project." Bailey further attested in the Proof of Claim that no credits were due to Atlantic. The bills sent by Clearwater to Atlantic, and supporting back-up documents, were attached to the Proof of Claim. The dates and amounts of the bills are: $8,299.18 (12/5/97); $7,565.36 (5/15/98); and $4,834.14 (5/15/98).

Clearwater did not transmit the Proof of Claim and supporting documents to Ulico until August 27, 1998. By then, Atlantic had paid the $4,834.14 bill, by check dated July 31, 1998, which was negotiated by Clearwater on August 6, 1998. There is no evidence that Clearwater informed Ulico about the payment, and the evidence showed that it did not amend or update its Proof of Claim to reflect the payment.

On August 31, 1998, Cherie Rondinelli, Bond Claims Manager for Ulico, wrote to John Madden referencing the Bond and Project and giving notice that Ulico had received a claim by Clearwater "alleg[ing] that [it is] owed $21,843.48 for damages provided to the above stated bond and project." Rondinelli asked Madden to advise her in writing, within 5 days of

receipt of the letter, of Atlantic's reasons for delaying payment to Clearwater.

On September 3, 1998, Thomas Madden responded in writing to Rondinelli's letter, stating that Atlantic had sent Clearwater a check for $4,834.14 in partial payment of Clearwater's bill and that the balance ($15,864.54) was "being disputed and must be resolved prior to completion of payment."

On October 26, 1998, Rondinelli wrote to Thomas Madden acknowledging receipt of his September 3, 1998 letter and saying:

> Atlantic continues to state that the balance due is being disputed and will be resolved prior to completion of the project. What is the nature of the dispute? Please provide the surety with documentation of the dispute and amount. Is the project complete, if no, what percentage of the project is complete? When do you expect the project to be completed?

In addition, Rondinelli asked for a copy of the canceled $4,834.14 check remitted to Clearwater and certain other documents pertaining to the Project.

On December 3, 1998, not having received a response to her October 26 letter, Rondinelli again wrote to Thomas Madden, referencing the Bond. She repeated that Ulico still had not received documentation to support Atlantic's "defenses against [Clearwater's] claim against the aforementioned bond[,]" and then emphasized:

> In order to proper [sic] and thoroughly investigate the above claim, it is imperative that the surety receive this information. Atlantic's lack of cooperation with Ulico is placing the surety in a difficult position of possibly having to incur a payment loss on this bond due to the lack of documentation and valid defenses.

Rondinelli again asked for the information requested in her October 26 letter and warned that if Atlantic did not respond within 5 working days, "[Ulico] may be forced to seek other avenues and seek restitution via its rights under the indemnity agreement."

Atlantic did not respond to the December 3 letter. On December 29, 1998, having heard nothing from Atlantic since her last correspondence, Rondinelli again wrote to Thomas Madden. She stated that Ulico had not received the requested documentation from Atlantic and that it had "validated Clearwater's claim of $20,698.62." Rondinelli advised that "Atlantic's lack of response and documentation [had] placed [Ulico] in a position of incurring a loss in [the amount of $20,698.62]" and demanded that Atlantic pay Ulico that sum, by check, within 5 working days of receipt of the letter. She admonished that if Atlantic did not make payment as demanded, Ulico "w[ould] be forced to seek other restitution via its rights under the indemnity agreement." Rondinelli's letter was sent to Atlantic by certified mail.

On December 31, 1998, Ulico issued a check for $20,698.62 to Clearwater. The check was delivered to Clearwater five days later, on January 4, 1999, when Clearwater executed an assignment of its claim against Atlantic to Ulico and a release of Ulico from all liability under the Bond. The release states, "the sum of $20,698.62 is justly due and owing by contract to [Clearwater] and that [Clearwater] has not released or discharged the same or any part hereof, that there are no counterclaims or set-offs to said account...."

By letter of January 5, 1999, which was transmitted to Ulico by facsimile at 4:50 p.m. that day, John Madden responded to Rondinelli's December 29 letter, stating he had received it that day (January 5); that he had called Rondinelli on December 11, but had been put in her voice mail, which had a message that she was out of the office for a few days, and he had not received a return call; and that he had again called her office that day (January 5) and was put in her voice mail, which by message stated she would be out of the office until January 7.

Madden's letter went on to state that the dispute over Clearwater's bill was "predicated on the fact that unauthorized work was performed and billed for" and that the invoices Atlantic had from Clearwater totaled $15,864.54, not

$20,698.62. The letter attached a copy of the disputed invoices and of Atlantic's July 31, 1998 cancelled check to Clearwater, for $4,834.14. Madden further stated that Atlantic had finished most of its work on the Project on September 13, 1998, with the exception of minor punch list items, and that the entire Project was completed on November 25, 1998. He concluded by directing Ulico not to make any payment to Clearwater. The next day, Madden sent another letter to Rondinelli, again complaining that he had made numerous telephone calls to Ulico that had not been returned.

Atlantic refused to make payment to Ulico. On September 19, 2000, in the Circuit Court for Prince George's County, Ulico filed suit against Atlantic, seeking to recover under the Indemnity Agreement the $20,698.62 it had paid Clearwater, plus interest, attorney's fees, costs, and expenses. Atlantic answered, and discovery ensued.

The case was tried to the court on December 14, 2001. By agreement of counsel, the deposition of Kathleen Palmer, a Claims Coordinator for Ulico, who worked under Rondinelli's direction, was moved into evidence, as were the documents identified by Palmer that constituted Ulico's claims file.[1] The documents include those we have discussed above.

John Madden appeared and testified on behalf of Atlantic. He stated that Clearwater had not supplied labor or materials for the Project for Atlantic. Rather, it had performed repair work on some hydraulic motors for a "CMI concrete belt placer" machine that Atlantic was using for the Project. Madden explained that the belt placer machine belonged to Atlantic, had a lifetime of 10 or 15 years, was not dedicated to the Project, and had been used on several other projects.

Madden further testified that Atlantic paid only $4,834.14 of the total amount billed by Clearwater because the balance was for materials, mostly pumps, that were not received by Atlan-

---

1. In December 1999, Safeco Insurance Company of America bought the surety claims department of Ulico; so when the deposition was taken and at the time of trial, Palmer actually was employed by Safeco.

tic and had been fraudulently obtained by one of its employees, who later was discharged, in a collaborative scheme with one of Clearwater's employees. Madden explained that the basis for Atlantic's dispute with Clearwater was set forth in a letter he wrote to Bailey (of Clearwater) on June 3, 1998. In that letter, Madden expressed disappointment that Bailey had not brought his concerns about the rogue Atlantic employee to Madden's attention earlier.

Madden's file copy of the June 3 letter to Clearwater bears a handwritten note, "Send to Ulico," dated September 3, 1998. Madden testified that he wrote that note to his secretary, directing her to send a copy of the June 3 letter to Ulico, to inform it of the basis for Atlantic's dispute over Clearwater's bill. He testified that he did not know whether the letter was sent, although he assumed it was. Madden's file does not contain any documentation that the letter was sent to Ulico before the end of December 1998, and Ulico's claim file does not contain the letter. Madden's September 3, 1998 letter to Rondinelli does not reference any attachments.

Madden testified that on several occasions in December 1998, he attempted to contact Rondinelli by telephone, leaving messages on her voice mail, but got no response.

At the conclusion of the trial, the court took the matter under advisement, and the parties submitted written motions for judgment.

On March 4, 2002, the court issued a decision by memorandum opinion and order. The court found that Ulico repeatedly had requested from Atlantic information and documentation about the dispute over the Clearwater claim but Atlantic had not provided Ulico the information or documentation until January 5, 1999, after Ulico had paid the claim and after it had notified Atlantic that it had paid the claim. The court concluded that "no issue of bad faith or fraud has been proven regarding [Ulico's] payment of Clearwater's claim" and that Ulico was entitled to "stand upon the letter of the [Indemnity] Agreement."

The court did not award Ulico full reimbursement of the sum it had paid to Clearwater, however. The court found that, notwithstanding that Ulico had paid Clearwater's claim in good faith, only part of Clearwater's repair work was covered by the Bond, and therefore Ulico was entitled to reimbursement only for that part of the claim that was covered by the Bond. The court based its conclusion on the definition of "Loss" in the Indemnity Agreement, which it interpreted to mean that Ulico only was entitled to reimbursement for claims paid that were covered by the Bond.

The court then read the Bond language to mean that payments covered by the Bond are those due and owing "to all persons supplying [Atlantic] with labor and materials in the prosecution of the work provided for in [the subcontract between Gilbert and Atlantic]. . . ." Relying upon several federal cases interpreting the Miller Act, 28 U.S.C. 270, *et seq.,* the court concluded that repairs to equipment used by a subcontractor that materially enhance the equipment's value so as to make it available for jobs other than the one covered by a surety bond are not payments within the scope of the bond. By contrast, repairs to a subcontractor's equipment incidental to carrying on the particular project covered by the bond that do not add to the value of the equipment are covered.

The court found that the repairs made by Clearwater to Atlantic's belt placer were not incidental; rather, they added to the value of the belt placer. Therefore, they were not covered by the Bond. The court further found that Clearwater's labor charges, totaling $3,234, aided in the completion of the Project, and therefore were covered by the Bond. On that basis, the court awarded Ulico $3,234 plus $614.46 in interest (at the legal rate of 6% from December 31, 1998, to the date of the decision).

Ulico filed a motion to alter or amend, asking the court 1) to reconsider its ruling and award it the full amount it had paid on Atlantic's behalf, and 2) to award it attorneys' fees, costs, and expenses under the Indemnity Agreement, an issue that

was raised at trial but was not addressed by the court in its decision. Atlantic filed an opposition.

On March 27, 2002, the court issued a written ruling that, under the language of the Indemnity Agreement, Ulico was entitled to recover attorneys' fees. The court then held an evidentiary hearing, on April 19, 2002. Ulico submitted bills and supporting documents showing the attorneys' fees it had incurred in prosecuting its suit against Atlantic on the Indemnity Agreement.

On May 3, 2002, the court issued a memorandum order finding that, under the circumstances of the case, an award of $5,750 in counsel fees to Ulico was fair and reasonable. On that basis, the court granted the motion to alter or amend, revised its award to a total sum of $9,598.46, and entered judgment in that amount.

Ulico noted a timely appeal, raising two questions, which we have rephrased:

I. Did the trial court err in not awarding Ulico the total sum it paid to Clearwater when the sum was paid without fraud and in good faith?

II. Did the trial court err or abuse its discretion in not awarding Ulico the full amount of attorneys' fees, costs, and expenses it incurred in pursuing recovery from Atlantic?

Atlantic noted a timely cross-appeal, presenting three questions. One question is simply a mirror image of Ulico's second question. We have combined and rephrased Atlantic's other questions, as follows:

III. Did the trial court err in awarding Ulico any part of the sum it paid Clearwater, because none of that sum was covered by the Bond or because the Proof of Claim form filed by Clearwater was defective, and in either case Ulico made the payment as a volunteer?

## DISCUSSION

This case is in essence a contract dispute over the parties' Indemnity Agreement, which, as noted, Atlantic and its own-

ers entered into as partial consideration for Ulico's issuing the Bond in connection with the Project. Ulico's two questions and Atlantic's cross-appeal question are interrelated, and we shall discuss them together.

A surety bond is a three-party agreement. In a performance bond, the surety assures the obligee that if the principal fails to perform its contractual duties, the surety will discharge the duties itself, either by performing them or paying the obligee the excess costs of performance. *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 259, 492 A.2d 1306 (1985); *Mercy Medical v. United Healthcare of the Mid-Atlantic, Inc.*, 149 Md.App. 336, 815 A.2d 886 (2003); *USF & G v. Feibus*, 15 F.Supp.2d 579 (M.D.Pa.1998), *aff'd*, 185 F.3d 864 (3rd. Cir.1999). In a payment bond, the surety guarantees the principal's duty to the obligee to pay its (the principal's) laborers, subcontractors, and suppliers. *Feibus*, 15 F.Supp.2d. at 581 n. 2.

A surety's liability on its bond is primary, and is joint and several with the principal. Upon default by the principal of the obligation to perform or pay, the surety is immediately liable. *Gen. Motors Acceptance Corp. v. Daniels*, *supra*, 303 Md. at 259, 492 A.2d 1306. The surety's liability is not secondary, like the liability of a guarantor. *Id.* at 260, 492 A.2d 1306. The bond is the measure of the surety's obligation. In the construction industry, it is standard practice for surety companies to require contractors for whom they write bonds to execute indemnity agreements by which the principal and its individual backers agree to indemnify the surety against any loss it may incur as a result of writing the bond on the principal's behalf. *See generally The Surety's Indemnity Agreement—Law & Practice* (Marilyn Klinger, *et al.*, eds., Am. Bar Assoc.2002).

In this appeal, neither party challenges the trial court's factual findings, including its finding that Ulico paid Clearwater in good faith, without fraud, in the belief that, as Atlantic's surety on a payment bond, it was liable to Clearwater for the unpaid repair charges Clearwater had billed to

Atlantic. As discussed above, the trial court concluded that, while the evidence showed that Atlantic had paid part of Clearwater's bill and may have had a valid defense to the rest of the claim, Atlantic neither apprised Ulico of those facts nor furnished documentation of them in a timely manner. The focal point of the appeal, from both parties' perspectives, is not the court's finding that on those facts Ulico paid Clearwater in good faith but its legal conclusion that, under the language of the Indemnity Agreement, even though Ulico paid Clearwater in good faith, Ulico was not entitled to reimbursement for a part of Clearwater's repair bill that, under the court's interpretation, was not covered by the Bond.

Ulico first contends that the court was legally incorrect in reading the Indemnity Agreement to mean that its reimbursement right was controlled by the terms of the Bond, so that having paid the claim in good faith, it nevertheless had to prove that it actually would have been liable to Clearwater on the Bond for the full amount of the claim before being entitled to reimbursement from Atlantic.

Ulico also contends that, even if the court correctly concluded that its right to reimbursement depended upon a showing that it would have been liable to Clearwater for the full payment under the Bond, the decision to limit the award still was erroneous because the plain language of the Bond covered all of Clearwater's claim. In addition, Ulico contends that the trial court erred in applying federal case law pertaining to the Miller Act in interpreting the common law Bond in this case.

Finally, Ulico contends that, under the terms of the Indemnity Agreement, it was entitled to recover the attorneys' fees, costs, and expenses it incurred in obtaining reimbursement from Atlantic, and that the court erred in awarding it only a part of its fees, expenses, and costs.

Atlantic counters that the trial court's conclusion that Ulico's right to reimbursement under the Indemnity Agreement was controlled by the terms of the Bond was legally correct, and that it properly used federal case law to interpret the Bond coverage language. It contends on cross-appeal, howev-

er, that the court's analysis of the language of the Bond did not go far enough and that the court should have found, as a matter of law, that none of the Clearwater charges were covered by the Bond. Atlantic asserts that because the Bond did not cover the charges, Ulico was not required to pay them, and did so merely as a volunteer; and that, as a mere volunteer, Ulico was not entitled to reimbursement. Atlantic maintains that because it had no liability to Ulico under the Indemnity Agreement, the court should not have ordered it to pay any part of Ulico's attorneys' fees, costs, and expenses. Finally, Atlantic also argues that Clearwater's Proof of Claim did not seek payment of repairs covered by the Bond and that is an additional reason why Ulico's payment was voluntary and not subject to reimbursement.

█ We note at the outset of our analysis that Atlantic's "volunteer doctrine" argument, which is based on common law principles, is misplaced. Equity implies a right to reimbursement by the principal in favor of the surety when the surety pays a debt for which the principal is liable. *Commercial Ins. Co. v. Pacific–Peru Constr. Corp.,* 558 F.2d 948, 953 (9th Cir.1977)). Many jurisdictions hold, however, that the right to reimbursement arises only after the debt has been paid, and when the surety was compelled to pay it, so that when the surety makes payment when not compelled to do so, it is deemed a volunteer, and is not entitled to indemnification. *See Gen. Accident Ins. Co. of Am. v. Merritt–Meridian Constr. Corp.,* 975 F.Supp. 511, 516 n. 4 (S.D.N.Y.1997).

█ When the surety and the principal have entered into an express indemnity agreement governing their rights, however, courts should not resort to implied indemnity principles to determine those rights. *Commercial Ins. Co. v. Pacific–Peru Constr. Corp., supra,* 558 F.2d at 953. In that situation, the surety's right to indemnity is determined by the language of the contract of indemnity. That is what is meant by the oft-used phrase that a surety is "entitled to stand upon the letter of his contract." *Id.; Fid. & Deposit Co. v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1163 (4th Cir.1983).

An express indemnity agreement, being a written contract, must be construed in accordance with the traditional rules of contract interpretation. "The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court." *Wells v. Chevy Chase Bank,* 363 Md. 232, 250, 768 A.2d 620 (2001). *See also Langston v. Langston,* 366 Md. 490, 506, 784 A.2d 1086 (2001); *Auction & Estate Reps., Inc. v. Ashton,* 354 Md. 333, 341, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358 (1999).

Contract interpretation "involves discerning the terms of the contract itself." *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194 (2001). As with statutory interpretation, we begin our interpretation with the principle that we must give effect to the plain meaning of the contractual terms. *Langston, supra,* 366 Md. at 506, 784 A.2d 1086. "Generally, when interpreting a contract's terms, our primary consideration is the 'customary, ordinary, and accepted meaning' of the language used." *Fister, supra,* 366 Md. at 210, 783 A.2d 194 (quoting *Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 305, 753 A.2d 533 (2000)) (in turn quoting *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.,* 324 Md. 44, 56, 595 A.2d 469 (1991)). The terms of the contract must be interpreted in context, and given their ordinary and usual meaning. *Langston, supra,* at 506, 784 A.2d 1086. When the court finds the language of a contract to be unambiguous, the court must give effect to its plain meaning. *Ashton, supra,* at 340, 731 A.2d 441.

In the Indemnity Agreement in this case, Atlantic promised to "indemnify [Ulico] from and against any and all Loss" and, to that end, to "promptly reimburse [Ulico] for all Loss." The agreement defines "Loss" to mean:

Any and all damages, costs, charges, and expenses of any kind, sustained or incurred by [Ulico] in connection with or as a result of: (1) the furnishing of any Bonds; and (2) the enforcement of this Agreement. Loss shall also include any

funds disbursed by [Ulico], or arranged for or guaranteed by [Ulico] for the use and/or benefit of any indemnitor. Atlantic further agreed in the Indemnity Agreement that

(1) originals or photocopies of claim drafts or payment records kept in the ordinary course of business ... shall be prima facie evidence of the fact and amount of such Loss; and (2) [Ulico] shall be entitled to reimbursement for any disbursements made by it in good faith, under the belief that it was liable, or that such disbursement was necessary or prudent.

In addition, Atlantic promised to deposit with Ulico on demand any reserve against Loss that Ulico required or deemed prudent to establish, "whether on account of actual liability or one which is, or may be asserted against it whether or not [Ulico] has made any payment therefore[,]" and to grant Ulico a security interest in certain pieces of its equipment.

 The resolution of Ulico's first contention depends upon the meaning of the "any Loss" and "good faith" clauses in the Indemnity Agreement. In our view, the plain language of the Indemnity Agreement did not require Ulico to prove, in order to receive reimbursement from Atlantic, that Clearwater's claim or any part of it in fact was covered by the Bond, *i.e.*, that in a contest between Clearwater and Ulico over the scope and coverage of the Bond, Clearwater would prevail.

In the "any Loss" clause, Atlantic promised to indemnify and reimburse Ulico for all "Loss," that is, "damages, costs, charges, and expenses of any kind," that Ulico "sustained or incurred ... in connection with or as a result of ... the furnishing of any Bonds" and "funds disbursed by [Ulico], ... for the use and/or benefit of" Atlantic and to reimburse Ulico "for any and all disbursements made by it in good faith, under the belief that it was liable, or that such disbursement was necessary or prudent."

 The pertinent language does not say (as it could have said) that, for the surety to be entitled to reimbursement, the expense or cost it incurred must be covered by or within the scope of the Bond. Rather, it says that the surety must

have incurred the expense or cost "in connection with or as a result of ... the furnishing of" the Bond. In the context in which the phrases "in connection with" and "as a result of" are used, they connote "with relation to" or "as part of." An expense or cost can be incurred or paid by a surety "in connection with ... the furnishing · of" or "as a result of ....the furnishing of" a bond without actually being covered by the bond. Indeed, any settlement paid by a surety on a claim against a bond is paid "in connection with" and "as a result of" the "furnishing of" the bond, notwithstanding that there will never be a determination whether the claim in fact was within the scope of the bond. Thus, when a surety pays a claim against a bond, it incurs an expense "in connection with" or "as a result of" the "furnishing of" the bond regardless of whether, had the claim been litigated instead of settled, it would have resulted in actual liability on the surety's part.

The "any Loss" clause in this Indemnity Agreement is similar to the language in the indemnity agreement in *USF & G v. Feibus, supra,* 15 F.Supp.2d 579, which provided that the surety was entitled to reimbursement for expenses incurred " 'by reason of ....the [principal's] having executed, provided or procured' " the bond. *Id.* at 584. The court in *Feibus* explained that such language, "is standard in surety agreements and simply defines the scope of the [agreement] to apply to payments made as a result of the procurement or execution of the" bond. *Id.*

In this case, Clearwater made a claim against the Bond because Ulico furnished the Bond for the Project. The payment by Ulico to Clearwater on that claim was made "in connection with ... the furnishing of" the Bond to Atlantic, that is, as a result of the Bond's having been procured and executed. The plain language of the "any Loss" clause of the Indemnity Agreement did not require Ulico to show that its payment to Clearwater in fact was for a claim actually covered by the Bond for Ulico to be entitled to reimbursement.

A contrary interpretation of the "any Loss" clause would be inconsistent with the "good faith" clause in the Indemnity

Agreement. Similar "good faith" clauses in indemnity contracts entered into as partial consideration for the issuance of surety bonds have been widely interpreted to mean that a surety that makes payment on a claim against the principal in good faith, that is, with a subjective belief that the surety is or will be liable to the claimant on the performance or payment bond, is entitled to reimbursement, irrespective of the surety's actual liability.

In *Fid. & Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc., supra,* 722 F.2d 1160 (4th Cir.1983) (applying Pennsylvania law), a contractor executed an indemnity agreement to induce the surety to issue a performance bond under a bridge construction contract with the Pennsylvania Department of Transportation (DOT). When the DOT made a claim against the surety, alleging that the contractor had defaulted by performing deficiently and refusing to repair its substandard work, the contractor told the surety it was not liable, and the surety initially denied the claim. Later, after the DOT blacklisted the surety from writing bonds for all other Pennsylvania public works projects, the surety paid the claim. It then sued the contractor for reimbursement under the indemnity agreement.

The contractor defended on the ground that the surety could not establish that it actually would have been liable to the DOT on the performance bond. The district court, in a bench trial, ruled in favor of the surety on the ground that under a "good faith" clause in the indemnity agreement the surety did not have to show actual liability on the bond—only that it had paid the claim in the good faith belief that it was liable. The operative clause stated:

In the event of any payment by the Surety, the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractors, or the Surety and the Indemnitors, or either or both of them, *the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by the [Indemnity] Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or*

*that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed;. . . .*

722 F.2d at 1163 n. 5 (emphasis added).

The Fourth Circuit affirmed, agreeing that the language of the "good faith" clause entitled the surety to reimbursement upon a showing that the claim was paid in good faith, without the surety's having to show actual liability on the claim. The court observed that clauses of that sort, "while strict, are common in contracts of indemnification executed by contractors and others to induce the execution of ... bonds by compensated sureties, and they have been uniformly sustained," subject to the exception that the surety makes the payment without fraud and not in bad faith. 722 F.2d at 1163–64.

Numerous cases decided before and after *Bristol Steel & Iron Works* have held that when there is a "good faith" clause in an indemnity agreement between a surety and principal and the surety paid the claim in the good faith belief that it was liable for it on the bond, the surety is entitled to reimbursement without having to prove that it actually was liable. *See Fireman's Ins. Co. v. Todesca Equip. Co.,* 310 F.3d 32 (1st Cir.2002) (applying Rhode Island law); *Commercial Ins. Co. v. Pacific–Peru Const. Corp., supra,* 558 F.2d 948; *Transamerica Ins. Co. v. Bloomfield,* 401 F.2d 357 (6th Cir.1968); *Engbrock v. Fed. Ins. Co.,* 370 F.2d 784 (5th Cir.1967); *USF & G v. Feibus, supra,* 15 F.Supp.2d 579 (M.D.Pa.1998); *Gen. Accident Ins. Co. of Am. v. Merritt–Meridian Constr. Corp., supra,* 975 F.Supp. 511; *Employers Ins. v. Able Green, Inc.,* 749 F.Supp. 1100 (S.D.Fla.1990); *Fireman's Fund Ins. Co. v. Nizdil,* 709 F.Supp. 975 (D.Or.1989); *Cont'l Cas. Co. v. Guterman,* 708 F.Supp. 953 (N.D.Ill.1989).

Atlantic argues that these cases are distinguishable from the case at bar, and therefore are not persuasive, for two reasons. First, in each case, the "actual liability" issue concerned a defense of the principal that could have defeated the claim on its merits and did not concern whether the claim was

covered by the Bond to begin with. And second, in each case, the language of the indemnity agreement contained a definition of "Loss" that was broader than the definition of that term in the parties' Indemnity Agreement. We disagree with both points.

To be sure, in most of the cases cited above, the principal was contending that it was not required to reimburse its surety under their indemnity agreement because the surety had paid the claim even though the principal had a valid defense to it; and the court interpreted the "good faith" clause to mean that the surety was entitled to reimbursement, so long as it paid the claim in good faith, whether or not the principal's defense would have resulted in no liability on the claim had the claim been litigated. In all those cases, however, the surety's decision to pay necessarily encompassed a decision that its own liability was equal to that of its principal, *i.e.*, that the claim was covered by the bond. That aspect of the decision simply was not contested by the principal.

Moreover, in the cases discussed above, like in the case at bar, the theory advanced by the principal (and in those cases rejected by the court) for why the surety should not receive reimbursement was rooted in the common law "volunteer doctrine" principle that a surety only is entitled to reimbursement if it was compelled to pay the claim, *i.e.*, was actually liable for the claim on the bond. The principals in the cited cases advocated that the good faith clauses in question did not permit a surety to make payment without showing that the principal's defense would have been defeated had the claim been litigated. Here, Atlantic advocates that the good faith clause does not permit Ulico to make payment without showing that, in litigation over whether the Bond applied to the claim, it would have been held liable on the Bond.

 "Good faith" clauses in indemnity agreements between sureties and principals are designed to eliminate the surety's obstacle to reimbursement under the common law volunteer doctrine. *Assoc. Indem. Corp. v. CAT Constr.*, 964 S.W.2d 276, 281 n. 2 (Tex.1998). The volunteer doctrine was

particularly troubling to the surety because it faced the "classic dilemma" of divided responsibilities to the claimant, who was insisting he was owed money (or performance), and to whom the surety was immediately liable, and to the principal, who was insisting that the claim lacked merit because it was defensible. "Good faith" clauses broadened the surety's indemnity right to cover the situation when it has exercised good faith business judgment to pay a disputed claim, instead of limiting it to the situation when it has paid a disputed claim by compulsion. *See generally* Hinchey, *Surety's Performance Over Protest of Principal: Considerations and Risks,* 22 Tort & Ins. L.J. 133, 141–43 (1986).

■ In the case at bar, Ulico made the same two-pronged decision that any commercial surety makes when deciding to pay a claim, and that the sureties in the cases cited above made. It decided that Atlantic's defense did not warrant contesting the claim, and that it (Ulico) was liable for the claim as was Atlantic, *i.e.*, Clearwater's claim was within the scope of the Bond. The purpose of the "good faith" clause is to entitle the surety to reimbursement when the surety has made the decision to pay a claim in good faith and without fraud. The decision Ulico made to pay the claim in this case was no different than the decisions made by the sureties in the cases cited above. The only distinction between this case and those is the aspect of the surety's decision that is under attack by the principal. That should not make a difference in the meaning of the "good faith" clause.

■ We hold that under the "good faith" clause, Ulico was entitled to reimbursement from Atlantic for a claim Ulico paid in good faith, without fraud, regardless of whether Ulico was actually liable for the claim—either by virtue of a defense of Atlantic to the claim or by virtue of the claim's being outside the scope of the Bond. Accordingly, once the trial court found that Ulico acted in good faith and without fraud in paying Clearwater's claim, it should have awarded Ulico reimbursement for its full payment on the claim.

As noted, Atlantic also maintains that the language of the "good faith" and "any Loss" clauses in the cases cited above differs from the language used in the Indemnity Agreement in this case. Specifically, it points to the *Bristol Steel & Iron Works* case, in which the indemnity agreement entitled the surety to reimbursement for sums paid in good faith "in and about the matters herein contemplated by this agreement," 722 F.2d 1160, 1163 n. 5, and the *Bloomfield* case, in which the indemnity agreement entitled the surety to receive reimbursement for payments made " 'of the character enumerated in the agreement,' " 401 F.2d 357, 359 n. 1. We see no meaningful distinction between the language employed in the agreements in those cases and in the Indemnity Agreement in this case. The language of the operative clauses in *Bristol* and *Bloomfield*, and the other cases cited above, did not restrict the sureties' right to reimbursement to sums paid that actually were covered by the bonds, even when the sums were paid in good faith; and neither does the operative language in the Indemnity Agreement here.

Our resolution of Ulico's first contention makes it unnecessary to address its other two contentions—that Clearwater's claim in fact was covered by the language of the Bond, and that the trial court erred in relying on federal cases interpreting the Miller Act in deciding the scope of the Bond. Likewise, our resolution of Ulico's first contention necessarily resolves Atlantic's contention on cross-appeal that the trial court erred in finding that it had any liability under the Indemnity Agreement.

We shall briefly address, however, Atlantic's argument that the Proof of Claim submitted by Clearwater was defective and, therefore, could not support a claim by Ulico for reimbursement under the Indemnity Agreement. Atlantic asserts that because Clearwater specified in the Proof of Claim that its work was done in performance of its contract with Atlantic, and not in performance of the subcontract between Atlantic and Gilbert, there was no payment obligation by Ulico as Atlantic's surety. Although Atlantic does not

challenge the trial court's findings on good faith, it appears to be arguing that Ulico must not have been acting in good faith in paying a claim on a defective Proof of Claim. In any event, the evidence clearly established that the Proof of Claim was not defective. The completed Proof of Claim form stated that the work done by Clearwater was "for repair to equipment used on paving job at I–85 North, Granville County project," which is the Project in question in this case.

■ Finally, and as noted above, Ulico challenges the trial court's decision to award it only a portion of the attorneys' fees, costs, and expenses it incurred in pursuing recovery from Atlantic under the Indemnity Agreement. Ulico argues that the definition of "Loss" in the Indemnity Agreement includes sums incurred by it "in connection with or as a result of . . . the enforcement of this [Indemnity] Agreement," and therefore Atlantic was contractually obligated to pay its attorneys' fees, costs, and expenses in prosecuting this case. Ulico complains that notwithstanding the trial court's conclusion that it was contractually entitled to fees, costs, and expenses, and its finding that the hourly rate charged by its attorney was reasonable, the court erred in declining to award it the full amount of fees, costs, and expenses it incurred.

The trial court properly concluded that under the terms of the Indemnity Agreement, Atlantic was contractually obligated to pay Ulico the sums it incurred to enforce the agreement, which would include its attorneys' fees, costs, and expenses. Indemnity agreements of this sort have been widely interpreted to entitle the surety/indemnitee to recover fees, costs, and expenses incurred in enforcing them. *See Fid. & Deposit Co. v. Bristol Steel & Iron Works, Inc., supra,* 722 F.2d at 1166.

■ When a contract entitles a party to recover attorney's fees, the trial court must examine the fee request to determine whether it is reasonable, even in the absence of a provision requiring that the fee request be reasonable. *Rauch v. McCall,* 134 Md.App. 624, 638, 761 A.2d 76 (2000). In this case, the trial court's decision on the issue of reasonableness necessarily was affected by its decision, in error, that Ulico

only was entitled to reimbursement for part of the monies it paid to Clearwater. Accordingly, the reasonableness of the sums sought by Ulico for attorneys' fees, costs, and expenses must be reconsidered in light of our decision that Ulico is entitled to full reimbursement of its payment to Clearwater.

We shall reverse the judgment of the circuit court and remand the case 1) for the court to award Ulico as damages the full amount it paid to Clearwater on the Clearwater claim; and 2) for the court to reconsider Ulico's contractual claim for attorneys' fees, costs, and expenses.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY THE APPELLEE/CROSS-APPELLANT.**